UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Dr. Luchy Hidalgo-Semlek

      v.                                Civil No. 1:19-cv-00436-JL
                                          Opinion No. 2020 DNH 190P

Hansa Medical, Inc.

**MEMORANDUM ORDER**

This employment case involves an allegedly wrongful termination, and alleged retaliation against an employee of a biopharmaceutical company claiming whistleblower status.  Plaintiff Luchy Hidalgo-Semlek sued her former employer, Hansa Medical, Inc., alleging that Hansa wrongfully terminated her for objecting to (or expressing concerns about) using health information obtained from patients via informed consent documents and other contractual agreements in unauthorized ways.  She seeks recovery under claims for both common law wrongful discharge (Count 1) and violation of the New Hampshire Whistleblowers' Protection Act, RSA 275-E, et seq. (Count 2).  This court has jurisdiction under 28 U.S.C. § 1332(a) (diversity) because Dr. Hidalgo-Semlek is a citizen of New Hampshire, Hansa is a Delaware corporation with its principal place of business in North Carolina, and the amount in controversy exceeds $75,000.

Hansa has moved for summary judgment on both counts, arguing that (1) Dr. Hidalgo-Semlek's common law claim fails because the circumstances of her termination did not implicate any public policies, (2) her statutory claim fails because she cannot establish that she engaged in any protected activity, and (3) Hansa's termination was for legitimate reasons, and not motivated by bad faith, malice, or retaliatory animus.  After reviewing the parties' submissions and hearing oral argument, the court concludes that Hansa has not carried its burden of showing that it is

entitled to judgment as a matter of law on Dr. Hidalgo-Semlek's claims, and so its motion for summary judgment must be denied. The record reveals material factual disputes about whether Dr. Hidalgo-Semlek engaged in protected conduct (for purposes of both claims), whether there was a causal connection between her alleged protected activity and her termination, and whether Hansa's stated reasons for terminating Dr. Hidalgo-Semlek were a pretext and motivated by bad faith, malice or retaliation, all of which go to the heart of Dr. Hidalgo-Semlek's claims.

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial by a rational fact-finder, and "material" if it could sway the outcome under applicable law. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010). In analyzing a summary judgment motion, the court "views all facts and draws all reasonable inferences in the light most favorable to the non-moving party." Id.

Where, as here, the plaintiff bears the ultimate burden of proof, once the movant has made the requisite showing, she can no longer "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Torres–Martínez v. P.R. Dep't of Corr., 485 F.3d 19, 22 (1st Cir. 2007). That is, the plaintiff "'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which [she] would bear the ultimate burden of proof at trial." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Even in employment cases, "where elusive concepts such as motive or intent

2

are at issue," summary judgment may be appropriate "if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Brandt v. Fitzpatrick, 957 F.3d 67, 75 (1st Cir. 2020) (quoting Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015)).

## II.   **Background**

The following facts, set forth in the light most favorable to Dr. Hidalgo-Semlek, are undisputed or accepted, except where noted.  Hansa is the United States subsidiary of Hansa Biopharma, AB, a Swedish biopharmaceutical company that is developing an enzyme treatment known as Imlifidase for adult kidney transplant patients.  Sometime around June or July 2017, Hansa hired Dr. Hidalgo-Semlek, along with Dr. Joshua Lee, as consultants to serve in the role of Senior Medical Science Liaison (MSL).  After approximately a year, Hansa converted Dr. Hidalgo-Semlek and Dr. Lee to employees.  Hansa's MSLs were generally responsible for the medical aspects of the development and trial support of Imlifidase and working with experts in the field of organ transplantation.  As part of her role as an MSL, Dr. Hidalgo-Semlek was also responsible for ensuring that Hansa's work was compliant with pertinent laws or regulations.

Dr. Lee and Dr. Hidalgo-Semlek were colleagues for the entire time that Dr. Hidalgo-Semlek was either a consultant or employee of Hansa.  Dr. Lee found Dr. Hidalgo-Semlek to be trustworthy, a person of integrity, and a great MSL who performed the job well.  Initially, Dr. Hidalgo-Semlek had no direct supervisor in the United States.  She first reported to Hansa's Chief Medical Officer Sam Angus, and when Angus left the company, she next reported to Dr. Christian Kjellman, Hansa's Chief Scientific Officer, from approximately May of 2018 to mid-September 2018.  Dr. Kjellman was not located in the United States, so he exercised somewhat limited supervision over Dr. Hidalgo-Semlek and Dr. Lee as U.S.-based employees.

Nevertheless, Dr. Kjellman's overall impression of Dr. Hidalgo-Semlek during the time she was reporting to him was that she did a good job.  During this time, Dr. Kjellman did not have to correct Dr. Hidalgo-Semlek's job performance and did not have any issues with her expense reports, which he was responsible for approving.

### A.    The kidney patient focus group

In early 2018, Dr. Hidalgo-Semlek and Dr. Lee worked first with the American Association of Kidney Patients and later with the American Kidney Fund to conduct a screening survey of each organization's membership.  The goal of the screening survey was to identify patients for a focus group that would take place at the AAKP's national meeting in June 2018. Dr. Hidalgo-Semlek developed the questions for the screening survey questionnaire and, after consultation with Hansa's legal counsel, prepared an informed consent document that was compliant with the Health Insurance Portability and Accountability Act of 1996 to send to survey respondents.  The informed consent document explained to screening survey recipients that their responses would only be used to

> identify a group of patients that meet our criteria for focus group tailoring individuals who has [sic] been on the waiting list for a period of time.  In addition to using your responses to identify potential participants in the focus group, Hansa also will use the responses to prepare questions and other information for the focus group and will synthesis [sic] the responses for internal use only.

Doc. no. 28-5, at 51.  It further explained that any personal data or information that survey respondents provided would "be destroyed by October 30, 2018."  Dr. Hidalgo-Semlek and Dr. Lee were listed on the informed consent document as Hansa's contact persons.

The screening survey questionnaire included 59 questions, and asked for the respondent's name, email address, detailed medical history, treatment history, and other medical information, prescription drug history, and what type of insurance the respondents had, among other

information.  Ultimately, patients from the AKF and AAKP's membership responded to the

screening survey questionnaire.  Only Dr. Hidalgo-Semlek and Dr. Lee were supposed to have

access to the raw data from the patient responses to the screening survey.  Dr. Hidalgo-Semlek

and Dr. Lee reviewed these responses to identify candidates for the patient focus group and out

of those selected, eleven agreed to participate.  The eleven focus group patients signed an

additional informed consent document for the focus group itself, which explained that "[t]he

purpose of the focus group is to gather information, so Hansa can better understand treatment

experiences of people with End Stage Renal Disorder."  With the assistance of a consulting firm,

rareLife Solutions, Hansa conducted the focus group on June 9, 2018.  Dr. Hidalgo-Semlek, Dr.

Lee, and Eric Litjens, then a patient advocacy consultant for Hansa, ran the focus group for

Hansa.  As required by the informed consent document accompanying the screening survey

questionnaire, Hansa destroyed the survey response information on October 30, 2018.

Shortly after the focus group, Dr. Hidalgo-Semlek internally circulated a brief overview

of the event.  She and Dr. Lee also prepared a short event summary document and contributed to

a more-detailed Executive Summary of the focus group prepared by rareLife.  Laura Wuerth of

rareLife circulated a draft of the rareLife Executive Summary to Hansa representatives on June

28, 2018.[1]  Litjens later forwarded the draft Executive Summary to Laura Higginson of Big

Arrow Group, a Hansa marketing consultant specializing in strategic planning, branding, and

communications for healthcare markets.  Dr. Hidalgo-Semlek promptly contacted Higginson and

asked her to delete the draft report, explaining that it contained personal information from the

patients and was not meant to be distributed externally.  Higginson confirmed that she deleted

the rareLife Executive Summary shortly thereafter.

---

[1] Doc. no. 25-8, Ex. 2.

**B.      The Strategic Registry of Transplant Recipient project**

Dr. Hidalgo-Semlek worked on another research project during the summer of 2018

involving an analysis of data from the Strategic Registry of Transplant Recipients.  The SRTR is

an entity that maintains a database of medical information on transplant patients and offers the

data to researchers and scientists for a fee.  In order to obtain the data, the recipient must design

and submit a scientific or research protocol to SRTR explaining how and why they are going to

use the data.  The recipient must also enter into a Data Use Agreement and Security Plan with

SRTR, which describe the scope of data being requested and govern how that data is to be used.[2]

Dr. Hidalgo-Semlek signed a Data Use Agreement and completed a Security Plan on

behalf of Hansa for the SRTR project.  The only Hansa personnel authorized to access the data

under the Security Plan and Data Use Agreement were Dr. Hidalgo-Semlek, Dr. Lee, Dr.

Kjellman, and Lena Winstedt.  The Security Plan also required Hansa to certify that it would take

certain precautions to secure and protect the privacy and confidentiality of the data.  In addition

to Dr. Hidalgo-Semlek, the Data Use Agreement was signed by a representative of the

Minneapolis Medical Research Foundation, a contractor of the Health Resources and Services

Administration of the U.S. Department of Health and Human Services responsible for operating

the SRTR database.

In the Data Use Agreement, Hansa specified three purposes for which it intended to use

the SRTR data.  The agreement required that Hansa use the data "solely for bona fide

research/analysis" and prohibited Hansa from using the data "for any commercial purpose that

could have a negative impact on patient welfare, such as offering, denying, or allocating

insurance; and adverse selection (e.g., identifying patients with high-risk diagnoses)."  Hansa

---

[2] Doc. no. 28-5, at 76.

further agreed and acknowledged in the Data Use Agreement that the data it was receiving was "private and confidential, and that unauthorized use [was] a violation of the terms of this Agreement and may subject the Recipient and its employees to appropriate sanctions found in #22 of this document."  Those sanctions included termination of the agreement, disqualification from receiving SRTR data in the future, and "further sanctions under 45 CFR Part 46 or other applicable laws."  Hansa requested and received a wide range of data from the SRTR, including transplant recipient demographics, medical and surgical histories, laboratory variables, and medication history.  The data contained organ transplant I.D.s, but was otherwise de-identified; that is, it did not include the patients' names, addresses, email addresses, telephone numbers, or IP addresses.

As part of the SRTR project, Hansa entered into a Master Services Agreement with The Terasaki Institute under which the Terasaki Institute would analyze the raw SRTR data and prepare an abstract with Hansa researchers, including Drs. Hidalgo-Semlek and Lee.  Under Hansa's Data Use Agreement with the SRTR contracting entity, Hansa was required to use both the raw SRTR data and any analysis of that data prepared by Terasaki consistent with the purposes stated in the Data Use Agreement.[3]

### C.    Hansa hires Vincenza Nigro

On approximately September 19, 2018, Vincenza Nigro began her employment as Hansa's Vice President of Global Medical Affairs.  Hansa hired Nigro for this role to oversee its medical affairs function, which included managing Dr. Hidalgo-Semlek and Dr. Lee.  This was the first time that Dr. Hidalgo-Semlek and Dr. Lee had a direct supervisor based in the United States.  As Nigro was getting up to speed at the start of her employment, Dr. Hidalgo-Semlek

---

[3] Doc. no. 28-2, at 18.

explained what projects she had been working on.  Approximately one week after Nigro's employment began, Dr. Hidalgo-Semlek first told Nigro about the patient focus group project, and more specifically, that the participants in the focus group were selected through a survey.

In early-October 2018, Nigro asked Dr. Hidalgo-Semlek to transition the patient focus group project to Litjens.  Dr. Hidalgo-Semlek responded by emailing Litjens the patient focus group summaries that were previously circulated.  The parties present differing versions of what happened next.

Dr. Hidalgo-Semlek testified – both at her deposition and in a declaration submitted with her objection to Hansa's summary judgment motion – that Nigro asked Dr. Hidalgo-Semlek "several times" to send the patient responses to the screening survey to Litjens to be used for marketing purposes.  These requests began, according to Dr. Hidalgo-Semlek, shortly after Nigro learned of the patient focus group project and the screening survey itself and continued into early November 2018.  Hansa contends that Nigro only asked Dr. Hidalgo-Semlek to provide Litjens with an "analysis" of some of the screening survey responses that Dr. Hidalgo-Semlek had prepared.  And at her deposition, Nigro denied knowing that Dr. Hidalgo-Semlek even possessed the raw screening survey response data.  The dispute over what Nigro asked for is significant because the raw data contained patient-identifying information and protected health information, while Dr. Hidalgo-Semlek's analysis did not include patient-identifying information.

It is undisputed that on the morning of November 13, 2018, Nigro sent Dr. Hidalgo-Semlek an email, on which Litjens was copied, which read, in part:  "Yesterday you discussed an analysis of the 800 patients surveyed, of which 300 completed the survey monkey questionnaire. You thought there were some interesting insights to be gleaned?  Can you send those results along to Eric with any other next steps?"  (Doc. no. 25-6, at 55).  Dr. Hidalgo-Semlek responded

by stating, "Yes, I can send you the analysis [Smiley Face]".  The parties dispute exactly what Nigro was asking for in her November 13 email.

In a November 29 email, it appears that Dr. Hidalgo-Semlek provided Nigro, Litjens, and others at Hansa the "results" or "analysis" that Nigro asked for on November 13.  In the email, Dr. Hidalgo-Semlek stated:

> VN[4] asked me to please share the survey patients results with the entire team. Recently, I got some computer issues that corrupted many of my excel and word files (a total mess).  However, I was able to gather the survey analysis from my Dropbox (thank God that I saved it in there).  Please see attached the survey analysis and feel free to contact me if you have any questions.  I hope this material is helpful to All.

The attachment to the November 29 email did not contain raw survey response data and Dr. Hidalgo-Semlek never provided the raw data to either Nigro or Litjens.

With respect to the SRTR project, on November 14, Nigro sought to bring Gina Ewy, then Hansa's Head of Global Market Access, into a meeting to discuss the progress of the SRTR project.  In response to Dr. Hidalgo-Semlek's email requesting the meeting, Nigro wrote on November 14 that she "would like to bring Gina into this discussion since she will need SRTR data for Market Access.  It will be good for her to understand the scope of the agreement."[5] Nigro's request troubled Dr. Hildalgo-Semlek and she expressed her concerns about Ewy's participation in the meeting to Dr. Lee and Dr. Kjellman.

### D.    The circumstances leading to Dr. Hidalgo-Semlek's termination

The transition from having limited supervision from abroad to having a U.S.-based direct supervisor was a difficult one for Dr. Hidalgo-Semlek and Dr. Lee.  Both Dr. Lee and Dr.

---

[4] "VN" presumably refers to Nigro.

[5] Doc. no. 28-5, at 74-75.

Hidalgo-Semlek struggled to adjust to having Nigro as their new manager, but the relationship between Dr. Hidalgo-Semlek and Nigro was especially strained.  The parties cite to a November 16, 2020 telephone call between Nigro and Dr. Hidalgo-Semlek as one source of that strain, but present vastly different versions of what transpired on that call.

Dr. Hidalgo-Semlek was in the emergency room receiving medical treatment at the time of the call.  Dr. Hidalgo-Semlek contends that she said little during the call, and rather, that Nigro chastised her, insulted her, and referred to her as a "simple [MSL]" who "need(ed) to learn [her] place."  Nigro testified that she did not say any of those things to Dr. Hidalgo-Semlek and it was instead Dr. Hidalgo-Semlek who displayed a combative and angry tone during the call. Regardless of who said what and how, Nigro testified that this November 16 phone call primarily influenced her decision to terminate Dr. Hidalgo-Semlek's employment.  Nigro decided on November 16 to terminate Dr. Hidalgo-Semlek, but did not inform her until several weeks later. Prior to notifying Dr. Hidalgo-Semlek that she was being terminated, Nigro also discussed her decision with Hansa executives Eva-Marie Joed and Soren Tulstrup, who supported it.  As discussed below, the parties characterize the exact reasons for Dr. Hidalgo-Semlek's termination differently and dispute whether those reasons were a pretext for retaliation.

Unaware that her supervisor had decided to terminate her, Dr. Hidalgo-Semlek wrote to Hansa's human resources representative Marie-Louise Rexo on December 2, 2018 to request a meeting.  The purpose of the meeting was to discuss problems Dr. Hidalgo-Semlek was having with Nigro.  Dr. Hidalgo-Semlek asked Rexo not to alert Nigro of the meeting, which they tentatively scheduled for later in December in Sweden.  Dr. Hidalgo-Semlek never met with Rexo, however, because on December 7, Nigro called Dr. Hidalgo-Semlek and informed her that her employment was terminated with immediate effect.

### III.   Analysis

####   A.   Common law wrongful discharge

In order to prevail on her wrongful discharge claim, Dr. Hidalgo-Semlek "must establish two elements: (1) that the discharge was 'motivated by bad faith, retaliation or malice'; and (2) that [she] was discharged 'for performing an act that public policy would encourage or for refusing to do something that public policy would condemn.'" Leeds v. BAE Sys., 165 N.H. 376, 379 (2013) (quoting Karch v. BayBank FSB, 147 N.H. 525, 536 (2002)).  Hansa argues that Dr. Hidalgo-Semlek cannot show as a matter of law that she was discharged for performing an act that a recognized public policy would encourage or refusing to do something that a recognized public policy would condemn.  It also argues that her discharge was not motivated by bad faith, retaliation or malice, and combines that argument with its arguments for why the discharge was not pretextual for purposes of Dr. Hidalgo-Semlek's statutory whistleblower claim.  The court addresses the parties' arguments about Hansa's motives in terminating Dr. Hidalgo-Semlek in Section III, D, infra.

####   1.   Public policy

Hansa contends there is no public policy implicated in this case.  This is, under any set of circumstances, a difficult argument to advance under New Hampshire law.  "The existence of a public policy" in a wrongful discharge case "calls for the type of multifaceted balancing process that is properly left to the jury in most instances."  Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915, 924 (1981).  "Although ordinarily the issue of whether a public policy exists is a question for the jury, at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law, and take the question away from the jury."  Short v. School Admin. Unit 16, 136 N.H. 76, 84 (1992) (citation omitted).

"Public policy includes a wide range of societal goals including safety and public welfare, protection of an at-will employee's promised compensation, and good faith reporting of reasonably perceived improper activity." Sheeler v. Select Energy & NEChoice, LLC, No. 03-cv-59-JD, 2003 WL 21735496, at *8 (D.N.H. Jul. 28, 2003) . "[T]he public policy violated by a wrongful discharge 'can be based on statutory or nonstatutory policy'" at the state or federal level. Karch v. BayBank FSB, 147 N.H. 525, 537 (2002) (quoting Cilley v. N.H. Ball Bearings, Inc., 128 N.H. 401, 406 (1986)). And the "multifaceted balancing process" articulated in Cloutier "does not impose absolute requirements" or require a source that "clearly expresses the policy in question." Grivois v. Wentworth-Douglass Hosp., No. 12-cv-161-JL, 2014 WL 309354, at *7 (D.N.H. Jan. 28, 2014) (quotations omitted). In fact, a plaintiff need not even show a "strong and clear public policy," Cloutier, 121 N.H. at 922, and when the public policy question reaches the jury, their finding "need not be supported by case or statutory law." MacDonald v. Tandy Corp., 796 F. Supp. 623, 626–27 (D.N.H. 1992), aff'd, 983 F.2d 1046 (1st Cir. 1993).

Dr. Hidalgo-Semlek has not clearly and consistently articulated what public policies she contends are at issue in this case or provided the sources for all these alleged policies. Nevertheless, viewing the summary judgment record as a whole and construing all admissible evidence in Dr. Hidalgo-Semlek's favor, the court concludes that her claims potentially implicate multiple public policies and more importantly, the absence of such policies is not so clear that this question should be taken from the jury.

Because the alleged public policies at issue have been something of a moving target for Hansa and the court to identify, the court summarizes them here. In her complaint, Dr. Hidalgo-Semlek alleged that public policy encouraged her to advise "Nigro of the legal restrictions on the

use of SRTR data and screening survey data," insist "that Hansa honor such restrictions," and report "her concerns that VP Nigro wished to use SRTR data for impermissible commercial purposes."[6]  She cited the source of these "legal restrictions" as "GDPR and HIPPA (sic) regulations."[7]  Further, she alleged that public policy discouraged "Hansa from using SRTR data and screening survey data for prohibited purposes."[8]

In her objection to Hansa's motion for summary judgment, Dr. Hidalgo-Semlek changed course a bit and argued that public policy encourages honoring contractual promises, such as Hansa's promises to patients in informed consent documents that it will only use data for the purposes authorized by the consent document.[9]  As a source for this alleged public policy, Dr. Hidalgo-Semlek pointed to the fact that New Hampshire recognizes a cause of action for breach of contract.[10]  She likewise argued – consistent with her complaint – that a jury could find that "public policy encouraged [her] to oppose use of the SRTR data for purposes – and by persons – unauthorized by the Data Use Agreement and the Security Plan" and cited potential federal legal sanctions for violating these agreements as the source of the alleged public policy.[11]

---

[6] Complaint (doc. no. 1) ¶ 33.

[7] Id. ¶ 15.  Dr. Hidalgo-Semlek also cites HIPAA as a source of the alleged public policies in a declaration submitted with her objection to Hansa's motion for summary judgment.  See Doc. no. 28-8, at ¶ 24.  The court need not decide whether GDPR provides a source of public policy here because plaintiff's counsel abandoned this argument in his summary judgment papers and at oral argument.

[8] Id. ¶ 34.

[9] Memo. of Law in Support of Objection (doc. no. 28-1) at 23-24.

[10] Id. at 23.

[11] Id. at 24.  Dr. Hidalgo-Semlek reiterates this argument in her surreply as well.  See doc. 30, at 3.

Finally, Dr. Hidalgo-Semlek added another layer to her public policy argument in her surreply.  There, she declared that public policy supports "truthfulness" and she performed acts encouraged by the public policy supporting truthfulness when she objected to Nigro's plan to use the raw data from the patient screening survey for marketing purposes – a "plan that, if carried out, would have rendered false the defendant's assurances to patients that the defendant would only use the patients' responses for the Patient Focus Group."[12]  Dr. Hidalgo-Semlek cited the New Hampshire Supreme Court's familiar Cilley decision as the source for the alleged public policy supporting truthfulness.  She further argued that public policy promoted the study or research of treatment experiences of patients with kidney disease, and that she performed acts to encourage that policy by refusing to provide screening survey data for unauthorized purposes.[13] Had she not taken these steps to protect the data, she claims, patients may refuse to provide their protected health information for research purposes in the future, thus thwarting the study of these patients' treatment experiences.[14]

**The first potentially implicated public policy**.  A jury could reasonably conclude that Dr. Hidalgo-Semlek's claims implicate one or more of the following public policies.[15]  First, HIPAA and other statutes[16] governing the privacy and confidentiality of medical records reflect a

---

[12] Surreply (doc. no. 30) at 2.

[13] Id. at 2.

[14] Id. at 2-3.

[15] While these are not stated in precisely the same way that Dr. Hidalgo-Semlek articulated them in her opposition papers, she is entitled to every reasonable inference from the record at the summary judgment stage.  And that record reveals several possible applicable public policies.

[16] See, e.g., RSA § 329:26 (creating a privilege for physician-patient communications); RSA § 332-I, et seq. (the N.H. equivalent of HIPAA).

"strong" policy of protecting medical records, and by extension, the medical information contained within those records.  McEvoy v. Hillsborough County, No. 09–cv–431-SM, 2011 WL 1813014, at *6 (D.N.H. May 5, 2011) (quoting United States v. Mazzola, 217 F.R.D. 84, 88 (D. Mass. 2003) (Bowler, C. Mag. J.)); see also United States v. Sutherland, 143 F. Supp. 2d 609, 612 (W.D. Va. 2001); Hageman v. Southwest Gen. Health Ctr., 119 Ohio St. 3d 185, 187-89 (2008) (relying on HIPAA to observe that "a person's medical records are confidential" and "[i]f the right to confidentiality is to mean anything, an individual must be able to direct the disclosure of his or her own private [medical] information.").  Medical privacy is therefore not only a fundamental concern of Congress as reflected in its enactment of HIPAA, but it is also a fundamental concern of the New Hampshire legislature and of society in general.  See United States v. Polan, 970 F.2d 1280, 1285 (3rd Cir.1992) (observing that the Constitution "provides qualified protection for medical records sought by search warrant or subpoena" and that "an individual's privacy interest in medical records must be balanced against the legitimate interest of others in obtaining disclosure").  When patients authorize HIPAA-covered entities and their business associates to access their protected health information through informed consent documentation, the patients expect that information to remain private and to be used only in accordance with the authorization they provide.  See 45 CFR § 164.508(c)(1)(iv) (requiring HIPAA-compliant authorizations to include a "description of each purpose of the requested use or disclosure") and § 164.508(a) (requiring protected health information obtained pursuant to an authorization to be used or disclosed "consistent with such authorization").

Like protecting the safety of hospital patients, a jury could reasonably find that Dr. Hidalgo-Semlek was acting in furtherance of the public policy protecting the privacy and limited use of medical records and protected health information when she objected or refused to provide

Nigro and Litjens with the raw screening survey response data.  See Grivois, 2014 WL 309354, at *9 ("Grivois's wrongful discharge claim is not that public policy encouraged her to disagree with her supervisors' decisions, but that public policy encouraged her to inform her supervisors of her concerns that those decisions endangered the safety of others. Because a rational jury could so find, the defendants' motion for summary judgment is denied insofar as it argues that Grivois took no action that public policy would encourage."); Glandon v. Keokuk Cty. Health Ctr., 408 F. Supp. 2d 759, 770 (S.D. Iowa 2005) (denying summary judgment on wrongful termination claim where plaintiff argued he was discharged as a result of reporting a potential HIPAA violation to the employer's privacy officer and a "clearly defined" public policy protected this activity).

This conclusion presumes the truth of Dr. Hidalgo-Semlek's allegation (as the court must under Rule 56) that Nigro asked Dr. Hidalgo-Semlek to provide Litjens with the raw data from the screening survey responses to be used for marketing purposes, as opposed to simply asking for an "analysis" of those responses.  If Nigro asked for the raw screening survey data, this could implicate HIPAA and the policies embodied in HIPAA, because that data contained personally identifiable information about patients and the authorizations granting Hansa access to the data limited how the information could be used.   Viewing the record in Dr. Hidalgo-Semlek's favor as the non-moving party, there is a genuine dispute as to what information Nigro asked for.  Dr. Hidalgo-Semlek asserts that Nigro asked for the raw data several times, both in verbal conversations and in e-mail, while Nigro denies ever asking for the raw screening survey data.[17] A rational jury could rule in either party's favor on this question for the following reasons.

---

[17] The fact that Dr. Hidalgo-Semlek testified that Nigro asked for the raw screening survey data several times, in multiple formats and in different circumstances, lends credence to her allegation.  Had Nigro only asked for the information once, for example, this may have

First, Dr. Lee's testimony supports the inference that Nigro asked for the raw screening survey response data.  Dr. Lee testified that "in or around October 2018" he had a conversation with Dr. Hidalgo-Semlek in which she told him that Nigro had requested the responses to the screening survey questionnaire.[18]  He further testified that Dr. Hidalgo-Semlek told him that she did not believe the survey responses could be turned over to Nigro.[19]  In response, Dr. Lee told Dr. Hidalgo-Semlek that he was "not in favor" of sending the survey responses to Nigro so that Nigro could send the data to Litjens.[20]

Second, additional testimony also supports the inference that Nigro asked for the raw survey response data and wanted Litjens to use it for marketing purposes.  For example, Litjens testified that he had a communication with Nigro regarding Dr. Hidalgo-Semlek's instruction that the screening survey data could not be used externally for marketing purposes.[21]  That conversation followed an October 8, 2018 email from Dr. Hidalgo-Semlek to a group of her colleagues including Nigro, Litjens, and Ewy, where Dr. Hidalgo-Semlek attached a "Full Summary Report" of the patient focus group, but noted that the "screening survey was excluded

---

suggested that Dr. Hidalgo-Semlek misunderstood the request or was simply mistaken about what Nigro was asking for.  The evidence here supports the inference that Nigro asked for the same screening survey response data multiple times over the course of two months.

[18] Doc. no. 28-2, at 16.

[19] Id.

[20] Id. at 16, 21.  Dr. Lee acknowledged that he disagreed with transmitting the screening survey data to Nigro and Litjens because they were proposing to use the data inconsistently with the informed consent authorization that the survey respondents and focus group participants had completed.  Id. at 18, 21.  Indeed, Dr. Hidalgo-Semlek and Dr. Lee were aware as early as June 9, 2018 that Litjens was looking for information from the patient focus group "for dissemination to patient groups to update their members on the outcomes of the patient focus group."  Doc. 28-2, at 92.

[21] Doc. no. 25-10, at 10-11.

since we can't use that information externally (e.g. for marketing)."[22]  While this email does not

necessarily establish that Nigro asked Dr. Hidalgo-Semlek for the raw screening survey data, it

undercuts Nigro's denial that she knew Dr. Hidalgo-Semlek possessed the raw data.

Third, evidence surrounding an earlier alleged unauthorized disclosure of a draft patient

focus group report to an outside consultant – Laura Higginson of Big Arrow Group – supports

the inference that Dr. Hidalgo-Semlek later objected to Nigro's request for the raw screening

survey data.  In late-June 2018, Litjens forwarded a draft focus group summary report from

rareLife to Higginson of Big Arrow.  Dr. Hidalgo-Semlek learned of the disclosure and asked

Higginson to delete and not distribute the draft report because "it contain[ed] personal

information from the patients" and "wasn't meant to be distributed externally."[23]  Hansa

contends in its summary judgment motion that Dr. Hidalgo-Semlek's concerns about this alleged

disclosure were misplaced and did not implicate HIPAA because the draft report identified

patients by a "number and initials only."[24]  Putting aside whether this disclosure implicated

HIPAA,[25] Dr. Hidalgo-Semlek's concerns about the Big Arrow disclosure bear on the question

of whether Nigro asked her for the raw screening survey response data because Dr. Hidalgo-

---

[22] Doc. no. 25-6, at 40.

[23] Doc. no. 28-6, at 38.

[24] Doc. no. 25-1, at 12.

[25] "Individually identifiable health information" for purposes of HIPAA includes both
information that identifies the individual and information "[w]ith respect to which there is a
reasonable basis to believe the information can be used to identify the individual."  45 C.F.R. §
160.103.  Information that identified a patient by a number and initials – in addition to other
health information about that patient – could reasonably be used to identify the patient and
therefore qualify as protected health information under HIPAA.  The court is thus insufficiently
persuaded by Hansa's argument that Dr. Hidalgo-Semlek's concerns about unauthorized
disclosures of the Big Arrow draft report did not implicate HIPAA.

Semlek testified that she discussed the Big Arrow disclosure with Nigro when Nigro later "asked [Dr. Hidalgo-Semlek] to provide the screening survey data in order for [Nigro] to give it to [Litjens] to create marketing materials for patients."  Dr. Hidalgo-Semlek was therefore already concerned that Litjens had disclosed patient information for marketing purposes without authorization, and a jury could logically conclude that she raised these concerns (using the Big Arrow disclosure as a prior example) with Nigro when Nigro asked her to make a similar unauthorized disclosure of the screening survey results data to Litjens.

Finally, while Hansa cites to Nigro's testimony as proof that it is undisputed that she did not ask for the raw screening survey data, her testimony was inconsistent at best.  Hansa also ignores Nigro's admission that Dr. Hidalgo-Semlek expressed concerns to Nigro that Nigro's request to turn over information about the patient focus group would run afoul of the informed consent document, and that Dr. Hidalgo-Semlek told Nigro that the "informed consent was somewhat limited as to how we would be able to use the data."[26]  Nigro did not recall what she said to Dr. Hidalgo-Semlek in response to these concerns, but Dr. Hidalgo-Semlek testified in detail about the conversations.  Specifically, Dr. Hidalgo-Semlek testified that she twice told Nigro that she had spoken with Hansa's legal counsel and that counsel advised her that the screening survey data could not be used for marketing purposes.  In response, according to Dr. Hidalgo-Semlek, Nigro stated "Luchy, I do this all the time.  Your legal team does not know what they're talking about."[27]

An oft-cited email from Nigro to Dr. Hidalgo-Semlek also clouds the record as to exactly what information Nigro was asking for from Dr. Hidalgo-Semlek.  As part of Nigro's effort to

---

[26] Doc. no. 28-5, at 57-59.

[27] Doc. no. 28-4, at 157.

transition the focus group project from Drs. Lee and Hidalgo-Semlek to Litjens, and in response

to an email from Dr. Hidalgo-Semlek in which she told Nigro that she "already hand[ed] over the

[patient focus group] information" to Litjens, Nigro wrote on November 13, 2018:

> Hi Luchy,
>
> Yes I am familiar with this report of the focus group for 11 patients.  Yesterday
> you discussed an analysis of the 800 patients surveyed, of which 300 completed
> the survey monkey questionnaire.  You thought there were some interesting
> insights to be gleaned?  Can you send those results along to Eric with any other
> next steps?
>
> Eric – is there anything else that needs to be transitioned?
>
> Best,
> Vincenza

Doc. 25-6, at 55.  Dr. Hidalgo-Semlek responded that same day by stating "Yes, I can send you

the analysis [smiley face]."  It is unclear from this email exactly what Nigro is asking for.  On

the one hand, she references an "analysis" of the survey responses, which suggests she was

asking for a narrowed-down analysis.  On the other hand, she asks Dr. Hidalgo-Semlek to "send

those results along to Eric" after referencing the patient screening survey.  Reasonable minds

could disagree as to what Nigro was asking for in her November 13 email.  In fact, Dr. Lee

acknowledged at his deposition that he was "not certain that at the time if [he] knew if" Nigro

was asking for "the patient focus group results or if it was the patient survey results" and that it

was "very possible that Luchy communicated that to me, that [providing the 300 completed

survey results] was the request."[28]

---

[28] Doc. no. 28-2, at 63.

Dr. Hidalgo-Semlek did not provide any information in response to Nigro's November 13 email until over two weeks later.  On November 29, Dr. Hidalgo-Semlek emailed Litjens, Nigro, and others at Hansa a "survey analysis."  In her cover email, she stated that

> VN asked me to please share the survey patients results with the entire team.
> Recently, I got some computer issues that corrupted many of my excel and word
> files (a total mess).  However, I was able to gather the survey analysis from my
> Dropbox (thank God that I saved it in there).  Please see attached the survey
> analysis and feel free to contact me if you have any questions.

Doc. 28-5, at 71.  The attachment did not contain the raw screening survey responses because that information had been destroyed on October 30.  This email, like Nigro's November 13 request, supports the existence of a factual dispute about whether Nigro was asking for the raw screening survey responses or just a de-identified analysis of that data.  The first sentence of Dr. Hidalgo-Semlek's email supports her allegation that Nigro asked for the survey results, as does the second sentence, which suggests that she tried to locate the raw response data but could not find it because of issues with her computer.  Dr. Hidalgo-Semlek nevertheless sent the "survey analysis" and did not tell Nigro that the raw response data had been destroyed.  This conversely suggests that Dr. Hidalgo-Semlek understood that Nigro was requesting a pared-down and de-identified analysis from the start.

Dr. Hidalgo-Semlek explained at her deposition that if she told Nigro that the screening survey responses had been destroyed and could not be sent, Nigro would have fired her on the spot.[29]  This is presumably because according to Dr. Hidalgo-Semlek, Nigro had been asking for the raw response data for weeks, including prior to the destruction date, and had Nigro learned that Dr. Hidalgo-Semlek was resisting the request while the data was still active and let it expire and be destroyed before responding to Nigro's request, Nigro would have terminated her

---

[29] Doc. no. 28-4, at 170-71, 187.

employment.  She further testified that she used "computer issues" as an excuse about why she could not locate the raw screening survey response data in an effort to get Nigro to "leave her alone" about that data.[30]  While Dr. Hidalgo-Semlek's explanation of these exchanges with Nigro are not particularly strong, they are plausible enough when viewed under the applicable Rule 56 standard to preclude summary judgment.  The court must construe this evidence in Dr. Hidalgo-Semlek's favor at the summary judgment stage, and a reasonable inference from her response, as well as the delay in providing it, is that she partially (and evasively) provided an "analysis" in the hope of placating Nigro, or perhaps delaying a confrontation with Nigro, rather than telling Nigro directly that the survey responses had been destroyed.  Either way, the court cannot accept as undisputed Hansa's conclusion that "[t]here is no evidence that Ms. Nigro pressed plaintiff to provide anything more" than her analysis of the data.[31]

Nigro further admitted that someone apprised her of a conversation with a representative of the AKF in which the representative told Hansa staff that if Hansa wanted to use the screening survey responses for other purposes, the patients would need to be re-consented.   This evidence supports the inference that Nigro knew Dr. Hidalgo-Semlek had the raw screening survey response data and asked her to send it to Litjens for marketing purposes, all before the data was to be automatically destroyed on October 30, 2018, and that Dr. Hidalgo-Semlek objected to this request.  Because a rational fact finder could reach a similar conclusion, there is a genuine dispute over this material fact that precludes summary judgment for Hansa.

**The second potentially implicated public policy**.  A jury could similarly find that public policy encouraged Dr. Hidalgo-Semlek to oppose the use of the SRTR data for purposes –

---

[30] Id. at 185.

[31] Doc. no. 29, at 5.

and by persons – unauthorized by the Data Use Agreement and the Security Plan.  The research authorized by these agreements is subject to federal regulations – 45 C.F.R. Part 46 – that reflect the "[b]asic [Department of Health and Human Services] [p]olicy for [p]rotection of [h]uman [r]esearch [s]ubjects."  45 C.F.R. § 46.101.  Part of that policy is ensuring that a person's private medical information is used consistent with the informed consent documents he or she signs, used only by those authorized under the Security Plan and Data Use Agreement, and used only for the purposes authorized by those documents.[32]

Violations of these use restrictions could subject Hansa to sanctions such as early termination of research support, disqualification from future access to the SRTR database,[33] or further sanctions under 45 C.F.R. Part 46 or "other applicable laws."[34]  Contrary to Hansa's contention, these are not merely, or solely, private contractual matters.  While private interests or internal management decisions do not typically implicate public policies, the agreements and restrictions on usage of the SRTR data are meant to protect the broader privacy interests of the patients who submit their information to be used for bona fide research purposes, as well as those patients' expectations that their data will only be used for research purposes.  45 C.F.R. § 46.101.  That distinction elevates this beyond a matter of private interest and into the realm of public policy.

---

[32] See, e.g., 45 C.F.R. §§ 46.103(a) ("Each institution engaged in research which is covered by this policy and which is conducted or supported by a federal department or agency shall provide written assurance satisfactory to the department or agency head that it will comply with the requirements set forth in this policy."), 116 (explaining the "[g]eneral requirements for informed consent"), 117 (requiring "[d]ocumentation of informed consent").

[33] See 45 C.F.R. § 46.123.

[34] Doc. no. 28-5, at 79.

As with the screening survey data, whether Dr. Hidalgo-Semlek's expression of concern regarding unauthorized use of SRTR data implicates public policy hinges on certain disputed facts. These factual questions include: (i) whether Dr. Hidalgo-Semlek reasonably believed that her colleagues at Hansa wanted to use SRTR data for unauthorized purposes; (ii) whether Nigro wanted to grant Ewy access to the SRTR data for unauthorized purposes; and (iii) whether Nigro knew Dr. Hidalgo-Semlek even had access to the SRTR data. Construing the factual record in Dr. Hidalgo-Semlek's favor, as it must at the summary judgment stage, the court concludes that a reasonable fact finder could answer each of these questions in the affirmative.

Hansa contends that it is undisputed that Nigro did not know that Dr. Hidalgo-Semlek had access to the SRTR data because Nigro presumed it resided with the Terasaki Institute. The court is not convinced. Most telling is Nigro's November 14, 2018 email to Dr. Hidaglo-Semlek where Nigro informed Dr. Hidalgo-Semlek that she "would like to bring Gina [Ewy] into this discussion since she will need SRTR data for Market Access. It will be good for her to understand the scope of the agreement."[35] On its face, that email could be construed as an explicit request from Nigro for Dr. Hidalgo-Semlek to provide the SRTR data to Ewy for arguably commercial purposes. While Nigro testified that she believed the Terasaki Institute would provide the data to Ewy, as with the screening survey results, a rational fact finder could construe this request (and how it would have been perceived by Dr. Hidalgo-Semlek) in several ways, including that Nigro wanted Dr. Hidalgo-Semlek to provide Ewy with the SRTR data for market access purposes.

Other evidence suggests there is a genuine dispute as to whether Nigro knew Dr. Hidalgo-Semlek possessed SRTR data and whether Nigro asked Dr. Hidalgo-Semlek to provide

---

[35] Doc. no. 28-5, at 74-75.

that data to Ewy.  For example, Dr. Hidalgo-Semlek sent Nigro an email on October 29, 2018

attaching a Master Services Agreement between Hansa and the Terasaki Institute.  In the

agreement, Hansa is defined as the "Client" and Exhibit A to the agreement explains that Hansa

had received SRTR data directly.[36]  Dr. Hidalgo-Semlek sent Nigro a copy of the master services

agreement again on November 16, 2018 at 4:05PM.  Dr. Hidalgo-Semlek also testified that when

Nigro joined Hansa, she apprised Nigro of every project she was working on, including SRTR.

A jury could therefore reasonably infer that Nigro was aware of the SRTR project, and likewise

aware of the fact that Hansa (and specifically, Dr. Hidalgo-Semlek) had access to the SRTR data

by the time Nigro asked Dr. Hidalgo-Semlek to involve Ewy in discussions about the project in

early November.

  Whether Nigro knew that Dr. Hidalgo-Semlek had access to the SRTR data is

nevertheless immaterial to the question of whether Dr. Hidalgo-Semlek's concerns about

providing this data to Ewy implicated any public policies.  It is undisputed that after the

November 14, 2018 email from Nigro, Dr. Hidalgo-Semlek knew that Nigro wanted Ewy to have

access to the SRTR data for "market purposes."  After learning of Nigro's intent to share the data

with Ewy, Dr. Hidalgo-Semlek testified that she expressed her concerns about Nigro's intentions

to Dr. Lee and Dr. Kjellman.  A rational jury could find that these concerns and her objection to

Ewy (who was not authorized to view the data) using the data for "market purposes" (which was

an unauthorized use) implicated the public policy surrounding the SRTR database discussed

above.

  The circumstances leading up to Dr. Hidalgo-Semlek's termination also involve more

than an employee's disagreement with internal policy decisions or management decisions.  Cf.

---

[36] Doc. no. 28-5, at 188.

Short, 136 N.H. at 85 (1992) ("Further, an employee's expression of disagreement with a management decision is not an act protected by public policy."); Bourque v. Town of Bow, 736 F. Supp. 398, 402-03 (D.N.H. 1990) (employee's complaints about his supervisor raised a managerial issue, not a matter of public policy).  Dr. Hidalgo-Semlek contends she was terminated for raising issues and concerns about actions – whether by her manager or others in the company – that she believed violated federal laws, not because she complained about Nigro's management or had a strained relationship with Nigro.  A jury could reasonably find that public policy protected and encouraged her actions.

> **The third potentially implicated public policy**.  A jury could also find that Dr. Hidalgo-Semlek was acting in furtherance of the public policy reflected in RSA 275-E:2 protecting whistleblowers and good faith reporting of perceived illegal activities.  This statute "recognizes a public policy favoring the good faith reporting of reasonably perceived illegal actions of employers by employees without retaliation, even if it is ultimately determined that the employer engaged in no illegal activity."  Karch, 147 N.H. at 537.  A like policy could be implicated here.

> To be clear, the court is not ruling that these policies exist or apply to Dr. Hidalgo-Semlek's termination as a matter of law.[37]  Instead, insofar as Hansa argues that the absence of a

---

[37] The court is skeptical about the validity of Dr. Hidalgo-Semlek's alleged public policies supporting "truthfulness" (as first argued in her surreply) and encouraging parties to honor contractual promises.  The public policy supporting "truthfulness" noted in Cilley was truthfulness in the context of an employee interacting with their employer, not, as Dr. Hidalgo-Semlek attempts to argue here, some generalized concept of truthfulness.  Likewise, the existence of a cause of action for breach of contract does not necessarily reflect a public policy encouraging compliance with contractual obligations, and Dr. Hidalgo-Semlek has cited no case law from New Hampshire or elsewhere recognizing such a broad public policy.  See W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983) (observing that public policy "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'") (quoting Muschany v. United States, 324 U.S. 49, 66 (1945)).  Dr. Hidalgo-Semlek may present these theories to the jury, but with proper instruction, the court has its doubts about whether the jury will accept them.

public policy is clear as a matter of law, the court rejects that argument and denies summary judgment.  A jury will decide what occurred between Dr. Hidalgo-Semlek and Nigro and whether Dr. Hidalgo-Semlek performed "an act that public policy would encourage" or refused "to do something that public policy would condemn.'" Leeds, 165 N.H. at 379.

Hansa raises several arguments as to why no public policy is implicated in this case, none of which persuade the court.  First, it argues that HIPAA cannot be a source of public policy because no private right of action exists for violations of the statute.[38]  The multifaceted approach to determining the existence of a public policy does not impose such an "absolute requirement."  See Grivois, 2014 WL 209243, at *6.  And Hansa does not attempt to argue how existing New Hampshire precedent in wrongful discharge cases, or even precedent from other jurisdictions, would support such an argument.[39]  The court therefore rejects it.  Regardless of whether HIPAA allows its victims to sue, the statute still embodies the strong public policy that medical records and personal health information should be afforded strict confidentiality and privacy protections.[40]

---

[38] Doc. no. 25-1, at 11.

[39] Indeed, if the court were to accept Hansa's private right of action argument, it would also have to accept Dr. Hidalgo-Semlek's argument that public policy supports the enforcement of contractual promises because New Hampshire recognizes a cause of action for breach of contract.  The court disagrees with both arguments under the facts and circumstances here.

[40] HIPAA provides a floor of privacy protections for a person's individually identifiable health information and does not preempt state privacy laws that provide greater protection than HIPAA.  Thus, while HIPAA may not have a private right of action, its New Hampshire counterpart affords a private right of action to individuals for violations of the statute.  See RSA § 332-I:6.  In addition, individuals who believe their HIPAA rights have been violated can file a complaint with the Office for Civil Rights within the Department of Health and Human Services.  See 45 C.F.R. § 160, subpart C, D, and E.  Victims of HIPAA violations are therefore not without any redress.

Second, Hansa argues that HIPAA cannot be a source of public policy in this case because Hansa did not disclose or threaten to disclose protected health information and the SRTR data was de-identified.[41]  This argument would require the court to construe the factual record in Hansa's favor, which is not permitted in this procedural posture.  Moreover, neither the New Hampshire Supreme Court nor this court has ever held that in order for a law or statute to be the source of a public policy, the employee must prove that the law or statute was actually violated.  In Grivois, for example, this court rejected the employer's argument that the employee's complaints about safety risks could only implicate public policy if those risks "result[ed] from the violation of 'established minimum standards or regulations.'"  2014 WL 309354, at *6.  Here, consistent with the flexible and "multifaceted" approach adopted in Cloutier, a jury could reasonably find that Dr. Hidalgo-Semlek's actions implicated the public policy embodied in HIPAA.  That is enough to preclude summary judgment.

But even assuming, for the sake of argument, that New Hampshire law requires a wrongful discharge plaintiff to establish that the actions complained about violated a law or statute in order for that law or statute to be the source of a public policy, Dr. Hidalgo-Semlek meets this requirement, at least when the summary judgment record is taken in the light most favorable to her.  Dr. Hidalgo-Semlek argues – and Hansa does not meaningfully dispute – that if Hansa wanted to use the raw screening survey response data for marketing purposes, this would have violated HIPAA.[42]  At oral argument, Hansa claimed for the first time that the informed

---

[41] Doc. no. 25-1, at 12-13.

[42] Dr. Hidalgo-Semlek argues that Hansa was either a covered entity, health care provider, or business associate as those terms are defined in HIPAA's regulations.  She likewise argues that using protected health information obtained from patients via an authorization for purposes beyond the scope of the authorization would violate HIPAA.  See Doc. no. 30, at 5; 45 CFR § 164.508(c)(1)(iv) and § 164.508(a).  Hansa does not dispute these allegations.

consent document for survey respondents was broad enough to allow Hansa to use the response

data for marketing purposes.  It is apparent from the text of the consent document, however, that

the primary purpose of the screening survey was to identify patients for a focus group.  Nowhere

does the document mention or authorize marketing, and general references to "gathering

information" or "for internal use only" do not indisputably provide an entity like Hansa license

to use the data for commercial purposes.  Dr. Lee testified that his understanding from this

informed consent document – similar to Dr. Hidalgo-Semlek's – was that the main purpose of

the screening survey was to identify focus group participants, and that Hansa did not have any

other authorized use for the data collected from the survey.[43]  In addition, there is evidence in the

record suggesting that Dr. Hidalgo-Semlek was concerned that Litjens would not only use the

raw survey response data for marketing purposes, but disclose that data to external entities, thus

violating the "internal use only" restriction in the consent document.

Dr. Hidalgo-Semlek has similarly established that Hansa would have violated the Data

Use Agreement, Security Plan, and HHS regulations governing human research subjects (45

C.F.R. Part 46) if it used the SRTR data for marketing or commercial purposes and disclosed that

data to unauthorized individuals.  Hansa does not appear to dispute this point either.  Thus,

assuming that a wrongful discharge plaintiff must prove an actual violation of a rule or law for

that rule or law to serve as the source of a public policy, Dr. Hidalgo-Semlek has met this

requirement.

Third, Hansa argues that Dr. Hidalgo-Semlek's concerns over using medical data for

improper marketing purposes were unfounded because Hansa's product was still in the

---

[43] Doc. no. 28-2, at 53-55.

development stage, not FDA approved, and therefore not "marketable."[44]  The summary

judgment record belies this argument.  Litjens– who Nigro asked Dr. Hidalgo-Semlek to share

the data with – is now Hansa's Vice President of Marketing.[45]  That his undefined role in

"patient advocacy" in 2018 did not include some elements of market research or product

commercialization is not the only possible inference on this record.  And Nigro's internal Hansa

email from November 14 stated that she wanted to bring Ewy – then Hansa's Head of Global

Market Access – into the discussion about the SRTR project and give her access to the SRTR

data for "market access," which reasonably could be construed as a purpose relating to marketing

or commercialization.  Finally, Dr. Hidalgo-Semlek testified at her deposition that Nigro asked

her to share the screening survey response data with Litjens so that he could use it for marketing

purposes,[46] and that Litjens had told Dr. Hidalgo-Semlek that he was creating marketing material

as part of the patient focus group project.[47]  The evidence therefore supports the inference that

Dr. Hidalgo-Semlek had genuine concerns that her colleagues at Hansa wanted to share the data

for marketing purposes or commercial purposes.

　　　It is also far from certain that (and certainly disputable whether) Hansa was not working

to market its product prior to receiving FDA approval.  Marketing and commercialization of a

---

[44] Doc. no. 25-1, at 12.

[45] In the excerpts of his deposition in the summary judgment record, Litjens testified that Big
Arrow Group – an outside entity that contracted with Hansa as part of the patient focus group –
"was involved in corporate communications, corporate branding and in patient advocacy" as well
as "strategic marketing."  Doc. no. 25-10, at 4, 6.  Based on this testimony and the other record
evidence summarized above, the court cannot conclude that Litjens, who worked closely with
representatives of Big Arrow as part of the focus group project, indisputably had no involvement
in marketing at this time.

[46] Doc. 28-4, at 40, 43.

[47] Id. at 43.

product does not happen overnight, and pharmaceutical companies presumably devote resources to future marketing of new products in advance of FDA approval.  There is likewise a difference between a product being "marketable" and a company looking into the potential future marketability or commercialization of that product during its development stage.  Hansa appears to have been undertaking the latter, at a minimum, while Dr. Hidalgo-Semlek was an employee, as it was working in some capacity in 2018 to gauge the market for its product and research key commercialization factors like pricing.[48]  Dr. Hidalgo-Semlek's concerns that both the SRTR data and screening survey response data were going to be used for marketing were therefore legitimate enough to make the factual disputes in play here both material and genuine.

Lastly, to the extent Hansa argues that Dr. Hidalgo-Semlek was simply performing her job duties, and therefore did not undertake any activities that public policy would encourage, that argument does not compel summary judgment.  A wrongful discharge claim may be based on an employee's conduct undertaken within her scope of employment.  In other words, though it may have been part of Dr. Hidalgo-Semlek's job responsibilities to identify legal compliance issues, public policy may still encourage her behavior.  See, e.g., Cloutier, 121 N.H. at 923 (employee's action was one that public policy would encourage, even though it was part of his job); Cook v. CTC Commc'ns Corp., No. 06-cv-58-JD, 2007 WL 3284337 (D.N.H. Oct. 30, 2007) (rejecting employer's argument that "that an employee who is cooperating with her employer and doing her job is not engaging in activities that public policy would encourage because such actions are merely routine").

---

[48] Testimony from Hansa's then-Vice President of Global Commercial Operations, Henk Doude van Troostwijk – which Hansa ignores in its motion – further establishes that Hansa (and Litjens) was conducting market research, commercial activities, and general marketing activities in 2017 and 2018, while its product was still in development.  Doc. 28-6, at 3, 16, 40.

B.      **Whistleblowers' Protection Act, RSA § 275-E**

In addition to her common law wrongful discharge claim, Dr. Hidalgo-Semlek asserts a

similar, but distinct claim for violation of the Whistleblowers' Protection Act.  New Hampshire's

whistleblower protection statute provides, in pertinent part, that

> I. No employer shall harass, abuse, intimidate, discharge, threaten, or otherwise
> discriminate against any employee regarding compensation, terms, conditions,
> location, or privileges of employment because:
>
> (a) The employee, in good faith, reports or causes to be reported, verbally or in
> writing, what the employee has reasonable cause to believe is a violation of any
> law or rule adopted under the laws of this state, a political subdivision of this
> state, or the United States; or
>
> (b) The employee objects to or refuses to participate in any activity that the
> employee, in good faith, believes is a violation of the law; or
>
> (c) The employee, in good faith, participates, verbally or in writing, in an
> investigation, hearing, or inquiry conducted by any governmental entity, including
> a court action, which concerns allegations that the employer has violated any law
> or rule adopted under the laws of this state, a political subdivision of this state, or
> the United States.

N.H. Rev. Stat. Ann. § 275-E:2.  Dr. Hidalgo-Semlek's claim under this statute implicates

subparts (a) and (b), which prohibit "employers from retaliating against an employee for

reporting or refusing to participate in what he or she reasonably believes is a violation of the

law." Clark v. New Hampshire Dept. of Employment Security, 171 N.H. 639, 654 (2019).

Courts apply a burden-shifting regime for RSA 275-E claims, and the "quality of the

evidence determines whether a 'pretext' or a 'mixed motive' analysis applies." In re Hardy, 154

N.H. 805, 812 (2007) (quoting Appeal of Montplaisir, 147 N.H. 297, 300-02 (2001)).  Here, the

parties appear to agree that because the record contains only circumstantial evidence of

retaliation, the "pretext" approach applies.  The New Hampshire Supreme Court has described

the pretext approach as follows:

Under the "pretext" . . . scheme, the employee bears the initial burden of establishing a prima facie case of unlawful conduct. To establish a prima facie case of retaliation, the employee must demonstrate that: (1)[she] engaged in an act protected by [RSA chapter 275–E]; (2)[she] suffered an employment action proscribed by [RSA chapter 275–E]; and (3) there was a causal connection between the protected act and the proscribed employment action.

Establishing a prima facie case of retaliation creates a presumption that the employer unlawfully retaliated against the employee. This presumption places a burden upon the employer to rebut the prima facie case—i.e., the burden to produce evidence that the adverse employment action was taken for legitimate, non-retaliatory reasons. The burden placed upon the employer is only a burden of production; the employee retains the burden of persuasion.

If the employer satisfies its burden of production, the presumption raised by the prima facie case is rebutted and drops from the case. The employee then has the opportunity to show that the employer's proferred [sic] reason was not the true reason for the adverse employment action and that retaliation was. The employee may do this either indirectly by showing that the employer's stated reasons were not credible, or directly by showing that the adverse employment action was more likely motivated by retaliation. Under the "pretext" approach, the employee retains the ultimate burden of persuading the trier of fact that he or she was the victim of unlawful retaliation.

Montplaisir, 147 N.H. at 300-02.  There is no dispute that Dr. Hidalgo-Semlek suffered an adverse employment action proscribed by RSA 275-E:2, namely, her termination.  The parties' disagreement and resolution of this motion instead depends on whether she engaged in an act protected by RSA 275-E:2 and whether a causal connection can be established between the protected act and her termination from Hansa.  The court concludes that Dr. Hidalgo-Semlek has put forth minimally sufficient evidence to meet her initial burden of establishing a prima facie case of unlawful conduct under the whistleblower's statute.  The court cannot conclude as a matter of law that Dr. Hidalgo-Semlek did not engage in protected acts under the statute, and Hansa's motion for summary judgment on this issue accordingly must be denied.

1.      **Protected act**

Hansa asserts that no rational jury could find that Dr. Hidalgo-Semlek reported what she had reasonable cause to believe was a violation of the law.  Relying on a decision from the District of Maine applying Maine's whistleblower protection statute,[49] Hansa argues that an employee making a whistleblower claim must have communicated to her employer that she thinks the reported act is illegal, and that Dr. Hidalgo-Semlek's failure to do so here is fatal to her claim.[50]  Hansa also appears to argue that the conduct being reported must actually be illegal in order for the report to qualify as a protected act.[51]  These arguments are misplaced for several reasons.

First, as far as the court can tell, no controlling precedent applying the New Hampshire whistleblower statute has imposed similar requirements on employees.  The statute does not expressly require a reporting employee to use the word "illegal" or "cite to the alleged violation" for their statement to constitute a "report" under RSA 257-E:2, I(a).  In re Fred Fuller Oil Co., Inc., 144 N.H. 607, 610 (2000).  To hold otherwise "would exclude an unsophisticated employee from the protections of the Act simply because he or she failed to invoke a specific law that the employer has allegedly violated."  Id. at 611.  Instead, the court will "presume that an employer is familiar with the laws and regulations governing its business" and "consider a report to have been made if a reasonable employer would have understood from an employee's complaint that the employee was reciting a violation of law."  Id.  Nor must the reported conduct be illegal in

---

[49] Maine's whistleblower protection statute offers narrower protection to employees than New Hampshire's statute.  See Me. Rev. Stat. tit. 26, § 833.

[50] See Doc. no. 25-1 at 15 (quoting Apon v. ABF Freight Systems, Inc., No. 2:15-cv-335, 2019 WL 2527089, at *3 (D. Me. June 19, 2019)).

[51] Id. at 16 ("Again, there is an absence of any remotely illegal conduct.").

the sense that it violates state or federal criminal laws.  The statute only requires that the employee had reasonable cause to believe the conduct she was reporting was in "violation of <u>any</u> law or rule adopted under the laws of this state, a political subdivision of this state, or the United States."  RSA § 275-E:2, I(a) (emphasis added).

Second, the statute "does not require an actual violation of a law or rule but only that an employee reasonably believed that such a violation has occurred." Cluff-Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 674 (2017) (quoting Appeal of Smithfield Dodge, 145 N.H. 23, 26 (2000)).  "Whether an employee had 'reasonable cause to believe' is an objective question; namely, whether a reasonable person might have believed that the employer was acting unlawfully."  Appeal of Osram Sylvania, Inc., 142 N.H. 612, 618 (1998) (quotation omitted).  Thus, under the statute, "a whistleblower need not establish the truth of his or her accusations to be protected" and "whether or not [Hansa] actually violated any law is beside the point; what matters is whether plaintiff had reasonable cause to believe that [Hansa] had violated the law."  Ingalls v. Walgreen E. Co., No. 10-CV-242-PB, 2011 WL 777948, at *5 (D.N.H. Mar. 1, 2011).  For her statutory whistleblower claim to survive summary judgment, Dr. Hidalgo-Semlek need not prove that the conduct she was reporting or objecting to actually violated a rule or law.

Third and finally, Hansa's argument focuses almost entirely on whether Dr. Hidalgo-Semlek's conduct constituted a protected "report" under the statute.  But Dr. Hidalgo-Semlek also has a separate claim under the Whistleblower Act arising from her objection or refusal to provide the screening survey results to Nigro and Litjens for unauthorized marketing purposes. See RSA § 275-E:2, I(b) ("No employer shall . . . discharge . . . any employee . . . because: (b) The employee objects to or refuses to participate in any activity that the employee, in good faith,

believes is a violation of the law").  Accordingly, even if the court found that Dr. Hidalgo-Semlek could not meet the "reporting" element of the statute, she would still have a claim under the statute based on her objection or refusal to participate in activity she reasonably believed was in violation of the law.

Dr. Hidalgo-Semlek argues that she reasonably believed that providing the screening survey results for marketing purposes would violate HIPAA (and thus objected to providing them or refused to provide them), and that misusing the SRTR data would violate "federal law," see supra Section III, A, 1, (and thus reported her concerns about doing so).  A rational fact finder could conclude that both actions constitute protected acts under the whistleblower statute.

**Screening survey data**.  Dr. Hidalgo-Semlek contends she objected to providing the screening survey data or refused to provide that data to Nigro or Litjens because she reasonably believed that doing so would violate HIPAA.  More specifically, Dr. Hidalgo-Semlek testified that she told Nigro:  "I was advised by Michelle [Hansa's external legal counsel] that this screening survey data cannot be used for marketing purposes."  Nigro conceded at her deposition that Dr. Hidalgo-Semlek raised concerns "that the informed consent was somewhat limited as to how we would be able to use the data."  And Dr. Hidalgo-Semlek testified that Nigro pushed back, telling Dr. Hidalgo-Semlek, "I do this all the time.  Your legal team doesn't know what they are talking about."

As discussed above, there is a genuine dispute as to whether Nigro asked Dr. Hidalgo-Semlek to share the raw screening survey responses (which contained the respondents' protected health information) or simply Dr. Hidalgo-Semlek's "analysis" of these responses (which was anonymized).  The distinction as to what Nigro asked for is significant because disclosing patient protected health information for unauthorized purposes could violate HIPAA or other medical

privacy laws, which goes to the question of whether a jury could find that Dr. Hidalgo-Semlek was objecting to some activity that she in good faith believed violated the law.  As discussed above in Section III, A, 1, supra, there is record evidence supporting the inference that Nigro asked for the raw response data.  There is likewise evidence that Dr. Hidalgo-Semlek reasonably believed that unauthorized disclosures of protected health information could violate HIPAA.  For example, Dr. Hidalgo-Semlek had HIPAA in mind when she drafted the informed consent document for screening survey recipients.  She even consulted with Hansa's legal counsel to confirm that the consent document had to be, and ultimately was, HIPAA compliant.  And she understood the limitations in the informed consent documents about how Hansa could use the data it was receiving from survey recipients.  Because the summary judgment record does not resolve these disputes of material fact, the court cannot decide as a matter of law that Dr. Hidalgo-Semlek's objection or refusal to provide the information was not a protected act under the Whistleblower Act.  That question is necessarily left to the jury.

**SRTR data**.  Dr. Hidalgo-Semlek further asserts that she engaged in protected acts by reporting concerns about Nigro wanting to involve Ewy in a discussion about the SRTR project and wanting Ewy to have access to the SRTR data.  She raised these concerns because she believed that unauthorized disclosures of the data would violate federal law, run afoul of the Data Use Agreement and Security Plan, and subject Hansa to sanctions by the federal government.  Dr. Hidalgo-Semlek alleges that she reported these concerns to Dr. Kjellman and Dr. Lee.  Specifically, she alleges that she told Dr. Kjellman words to the effect of "I don't like the way [Nigro] is handling this, specifically when it comes to the SRTR data project and when it comes to this, to the screening survey data.  Help me, please."  And, "I am nervous, because what [Nigro's] asking me to do – I don't feel comfortable with what she's asking me to do.  I

don't feel comfortable."  She further testified that Dr. Kjellman told her "Luchy, I will help you. I will try to ameliorate the situation with her."  Dr. Hidalgo-Semlek then said to Dr. Kjellman "I have a meeting with her.  What am I going to say?", to which Dr. Kjellman responded "Don't worry.  I will speak with her.  Just calm down."

Dr. Lee recalls having a conversation with Dr. Hidalgo-Semlek about her concerns over Nigro's use of the SRTR data, but does not recall the specifics of the conversation.  Dr. Kjellman vaguely recalls discussing with Dr. Hidalgo-Semlek a "friction" between her and Nigro arising from Dr. Hidalgo-Semlek's concerns about a request from Nigro relating to the SRTR project, and also recalls that Dr. Hidalgo-Semlek was concerned about Ewy having access to SRTR related data.  But he did not recall telling Dr. Hidalgo-Semlek that he would speak with Nigro, and had no recollection of speaking with Nigro about Dr. Hidalgo-Semlek between September 2018 and December 20108.  He did not, however, unequivocally deny that these conversations with Nigro ever occurred; he instead testified that he did not remember if they did.  Nigro testified that she did not believe she spoke to Dr. Kjellman about SRTR data in November 2018, but she was "not quite sure."  It is therefore not undisputed – as Hansa repeats in its briefing – that Dr. Kjellman did not relay Dr. Hidalgo-Semlek's concerns to Nigro.

Dr. Hidalgo-Semlek's text messages to Dr. Lee around the time of November 16 phone conversation support the inference that Dr. Hidalgo-Semlek was concerned about Nigro's intent to share the SRTR data with Ewy, and shared those concerns with Dr. Lee.  For example, on November 16, at 3:45PM, Dr. Hidalgo-Semlek asked Dr. Lee via text:  "Can you ask what she is trying to do with Gina?"  Dr. Hidalgo-Semlek's text messages with Dr. Kjellman similarly support the inference that they spoke on November 16 about her concerns over improper use of the SRTR data.  At 12:27PM, Dr. Hidalgo-Semlek wrote to Dr. Kjellman: "Do you have

38

sometime to speak with Josh and I today?" to which he responded "Sure give me a call."  Later that afternoon at 3:34PM, Dr. Hidalgo-Semlek wrote to Dr. Kjellman, "Please try to join that call next Tuesday with the Terasaki Institute," which was the call about the SRTR project that Nigro was trying to get Ewy to join.[52]

       Dr. Hidalgo-Semlek's communications to Dr. Lee and Dr. Kjellman, while somewhat obscure, express enough discomfort or concern that a reasonable employer would have understood that she was reporting some violation of law.  This is certainly a close call in light of other New Hampshire decisions in statutory whistleblower claims where the employee's reports have been more robust.  See Appeal of Seacoast Fire Equip. Co., 146 N.H. at 606-07 (employee reported illegal dumping of fire extinguisher residue and wage law violations); Appeal of Osram Sylvania, 142 N.H. at 614-15 (employee filed a safety complaint that temperatures at the employer's production plant were excessive in violation of the federal Occupational Safety and Health Act).

       While Dr. Hidalgo-Semlek did not cite the violation of any specific provision of law, or use the words illegal or unlawful in her communications with her colleagues at Hansa, a rational fact finder could find that Hansa would "have understood from [Dr. Hidalgo-Semlek's] complaint that [she] was reciting a violation of law."  In re Fred Fuller Oil Co., 144 N.H. at 611; see also In re Leonard, 147 N.H. 590, 595-96 (2002) (finding an employee's objection to employer that employee did not want to work on his scheduled day off was a "report" of a violation of law by employee, within meaning of Whistleblowers' Protection Act, despite the fact that employee did not cite the state day-of-rest statute; employer was presumed to have been familiar with the laws and regulations governing its fuel delivery business).

---

[52] Doc. no. 28-3, at 39.

In Leonard, the employee's alleged report of unlawful activity was vague and consisted of him telling his boss:

> I need a day off, I was tired. My wife was coming down with another MS attack where her eyes get blurry and she was getting really stressed out from all the hours I was working and I need to spend some time with her and I had also planned a snowmobile trip for that Sunday afternoon.

147 N.H. at 592. The employee argued that this complaint constituted a report of an alleged violation of the New Hampshire "day of rest" statute, RSA 275:33. Notwithstanding that the employee did not reference the statute in his complaint, or even blow the whistle in the traditional sense, the Court held that "a reasonable employer would have understood [the employee's] refusal to work that day as alleging a violation of the day of rest statute." Id. at 596. Moreover, the court observed that "faulting [the employee] for failing to expressly reference the day of rest statute would undermine" the tenet from Fred Fuller Oil that the Act "does not expressly require a reporting employee to cite to the alleged violation." Id. (quoting Fred Fuller Oil, 144 N.H. at 610). The court reaches a similar conclusion here. As a biopharmaceutical company engaged in extensive medical research involving patient data and personal medical information, Hansa is presumed to be familiar with the laws and regulations governing medical privacy, informed consent, and contracting with government agencies like DHHS that maintain databases like SRTR. A reasonable employer in Hansa's position therefore would have understood that Dr. Hidalgo-Semlek was reciting a violation of the law when she expressed concerns and discomfort about Nigro's plan to involve Ewy in a discussion about the SRTR project and grant Ewy access to the SRTR data for unauthorized commercial purposes.

Relying again on Maine law, Hansa argues that Dr. Hidalgo-Semlek's concerns about unauthorized use of SRTR data involve only an ordinary breach of contract and not a violation of the law. See Doc. no. 21 (citing Lee v. Town of Denmark, 206 A.3d 907 (Me. 2019)). The

contract at issue in Lee was an employment contract and the court held that "[a] dispute over the interpretation of an employment contract, without more, as is the case here, does not constitute a report of illegal activity." Id. at 910. The "more" is present here. Dr. Hidalgo-Semlek's reports concerned her supervisor's attempts to breach commitments to transplant patients and the federal government regarding a patient's medical privacy and the scope of what their data would be used for, which would potentially violate not only the applicable contracts but DHHS regulations applicable to such contracts and research. Her concerns were legitimate and reasonably could have been construed by her employer as a report that the employer was acting unlawfully. A jury could accordingly find that Dr. Hidalgo-Semlek engaged in protected acts under the whistleblower statute by not only objecting to conduct she believed violated the law, but by reporting conduct she reasonably believed violated the law.

## C.      Causal connection

To prevail on each of her claims, Dr. Hidalgo-Semlek must establish a causal link between her protected activity and her termination. See Leeds, 165 N.H. at 379 (noting causation as an element of common law wrongful discharge claim); Montplaisir, 147 N.H. at 300 (noting causation as part of employee's prima facie case for establishing a violation of whistleblower statute). Hansa does not seek summary judgment for lack of causation, and neither party meaningfully addresses causation in their summary judgment briefing, focusing instead on public policy, protected activity, and pretext, bad faith, and malice. The court is "free to disregard arguments that are not adequately developed" in the parties briefing,[53] and may take

---

[53] Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999); see also Coons v. Indus. Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) (citing Higgins for the proposition that district courts are "free to disregard" arguments not developed in the parties' briefs, and that such arguments cannot be "resurrected on appeal").

it one step further and deem waived "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Because the parties touched on causation at oral argument (after the court's prompting), the court does not deem this issue waived and briefly addresses those arguments here.  Hansa argues that Dr. Hidalgo-Semlek cannot establish causation because there is not a single piece of evidence demonstrating a causal connection between Dr. Hidalgo-Semlek's protected acts and her termination.  Circumstantial evidence may establish causation, however, as it is rare that an employer will admit retaliatory animus in testimony or written evidence.  See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) ("[A] plaintiff should not be required to produce 'smoking-gun' evidence before prevailing in a discrimination suit. There are many veins of circumstantial evidence that may be mined by a plaintiff to this end.").  One type of circumstantial evidence of causation is the temporal proximity between the protected acts and the adverse employment action.  See Guilfoile v. Shields, 913 F.3d 178, 194 (1st Cir. 2019) ("[plaintiff] has plausibly pleaded that he was retaliated against because of his protected conduct, given the close temporal proximity -- about a week -- of his termination to his final conversation with" defendant regarding purported violations of federal law); Cook, 2007 WL 3284337,  at *7. ("The close temporal proximity between the protected activity and the termination is some evidence of a causal connection.").

In fact, "[t]emporal proximity of an employee's protected activity to an employer's adverse action can be sufficient circumstantial evidence of causation to survive summary judgment."  Workman v. Outfront Media, LLC, No. 19-CV-10746-RWZ, 2020 WL 4201195, at *2 (D. Mass. July 22, 2020) (citing Mesnick, 950 F.2d at 828); see also Sánchez-Rodríguez v.

AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012) ("Very close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection . . . ."). Thus, for purposes of establishing causation for purposes of her prima facie case, Dr. Hidalgo-Semlek may rely solely on the temporal proximity between her protected acts and her termination, which here is very close. Such timing is "strongly suggestive of retaliation" and sufficient to meet Dr. Hidalgo-Semlek's burden of making a prima facie showing of causation.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 50 (1st Cir. 2010).

Hansa's counsel conceded at oral argument that temporal proximity alone may be enough to make out a prima facie case of causation, and instead focused much of his argument (as with his briefing) on the pretext question. At oral argument, Dr. Hidalgo-Semlek's counsel nevertheless cited to several other facts, which, in addition to temporal proximity, suggest a causal link between Dr. Hidalgo-Semlek's protected activity and her termination. Moreover, in order to find a complete lack of causal connection, the court would have to accept Hansa's stated motivation for terminating Dr. Hidalgo-Semlek's employment. For the reasons discussed below, the court declines to do so. Dr. Hidalgo-Semlek has demonstrated that questions of material fact exist about whether Hansa's stated reasons for her termination truly reflect Hansa's actual motive. The court therefore finds that Hansa is not entitled to summary judgment based on an alleged absence of causation.

### D.      Hansa's motivation for terminating Dr. Hidalgo-Semlek

The "bad faith" element of a wrongful discharge claim and the "pretext" element of a whistleblower claim turn on similar proof. The parties blended their analysis of these elements in their briefs and did not treat them separately, so the court will do the same.

Under the burden-shifting standard for a whistleblower claim, if an employee establishes a prima facie case, the burden shifts to the employer to rebut the presumption of retaliation by producing evidence that it took the adverse employment action for legitimate, non-retaliatory reasons. Montplaisir, 147 N.H. at 301. Hansa has produced evidence that it terminated Dr. Hidalgo-Semlek because Nigro found her to be unmanageable and unable to take direction, and because of concerns over irregularities in her expense reimbursement requests. This evidence satisfies Hansa's burden of production.

Having met its burden of production, the burden then shifts back to Dr. Hidalgo-Semlek to prove that Hansa's proffered reasons for her termination were pretextual. Dr. Hidalgo-Semlek "may do this either indirectly by showing that the employer's stated reasons were not credible, or directly by showing that the adverse employment action was more likely motivated by retaliation." Montplaisir, 147 N.H. at 302. A plaintiff may also show pretext by establishing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for the challenged employment action. Theriault v. Genesis HealthCare, LLC, 890 F.3d 342, 353 (1st Cir. 2018).

Proving bad faith or malice for purposes of a common law wrongful discharge claim requires a similar analysis. An employer's bad faith or malice may be established where "(i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 44 (1st Cir. 2001) (citing Cloutier, 121 N.H. at 921-22). Bad faith can also be discerned from the course of events surrounding an employee's discharge, "the manner in which the plaintiff was discharged," or shifting reasons for an employee's termination. See Cloutier, 121 N.H. at 921; E.C. Waste, Inc.

44

v. NLRB, 359 F.3d 36, 44 (1st Cir. 2004) (changing reasons for an employee's dismissal may raise an inference of pretext).  While bad faith or malice comes in many forms, undisputed facts showing that an employer terminated an employee for legitimate business reasons will not support a finding of bad faith.  See, e.g., Straughn, 250 F.3d at 44-45 (no bad faith where employee discharged for dishonesty); MacDonald, 796 F. Supp. at 627-28 (no bad faith where employee was fired because he was suspected of stealing money from the company); Antonis v. Elecs. for Imaging, Inc., No. 07-cv-163-JL, 2008 WL 5083979, at *3 (D.N.H. Nov. 25, 2008) (no bad faith where employee terminated pursuant to a company-wide reduction in force).

The court exercises "particular caution" when considering an employer's motion for summary judgment raising issues of "pretext, motive, and intent," Straughn, 250 F.3d at 34, and is mindful that "summary judgment procedures should be used sparingly in [such] cases" because "issues of credibility take on special importance." Bourque, 736 F. Supp. at 403.  With these principles in mind, the court now analyzes whether Hansa terminated Dr. Hidalgo-Semlek in bad faith and whether Hansa's stated reasons for the termination were a pretext for retaliating against her for blowing the whistle.

Hansa cites two reasons for Dr. Hidalgo-Semlek's termination, in order of importance: (i) principally, that Nigro found plaintiff "unmanageable" and unable to take direction; and (ii) secondarily, concerns about Dr. Hidalgo-Semlek's expense reporting. [54]

---

[54]Doc. no. 25-1, at 5, 22.  In her summary judgment briefing, Dr. Hidalgo-Semlek cites and discredits other alleged reasons for her termination that Nigro referenced in her deposition, including Dr. Hidalgo-Semlek's failure to "engage" with Nigro, specifically, a failure to give Nigro a scientific message platform, and Dr. Hidalgo-Semlek's failure to provide Nigro with the contact information for a Dr. Montgomery.  Doc. 28-1, at 18.  Hansa does not argue that these are separate and independent reasons for the termination, but argues instead that they are examples of the principal reason for Nigro's decision.  Doc. 29, at 10 n. 3.  Inconsistencies in an employer's reason for an adverse employment decision may be evidence of pretext.  See Billings v. Town of Grafton, 515 F.3d 39, 56 (1st Cir. 2008) (inconsistent "accounts about who made the

It argues that the relationship between Nigro and Dr. Hidalgo-Semlek was strained and tension-filled and cites to unspecific "hostile exchanges" on conference calls as the prime example of the strain.  Hansa then argues that the tension "came to a head" during a November 16, 2018 conference call for the medical affairs team.  The parties do not dispute that Dr. Hidalgo-Semlek participated in the call from a hospital emergency room.  Nor do they dispute that what transpired on this call led to Nigro's decision to terminate Dr. Hidalgo-Semlek's employment; a decision Nigro made on November 16.

Other key details of this November 16 call are either hotly disputed or undiscernible from the record.  For example, it is unclear from Dr. Lee's testimony whether he was even on the call, as he was unable to provide any details to substantiate Dr. Hidalgo-Semlek's recollection or Nigro's recollection.[55]  Nigro testified that she spoke with Joed several days after the November 16 call and told Joed about Dr. Hidalgo-Semlek's angry and aggressive behavior on the call and that she did not think she could manage Dr. Hidalgo-Semlek.  Nigro further testified that she also mentioned questionable expenses to Joed.  Joed does not remember this conversation with Nigro, but generally recalled that Nigro was concerned about Dr. Hidalgo-Semlek having problems

---

decision to transfer [the plaintiff] and, more importantly, how it was made" can serve as evidence of pretext).  A rational fact finder could find such inconsistencies here, both as to whether the decision to terminate was Nigro's alone or a collective decision and as to the reasons for that decision (i.e., unmanageable, unable to take direction, refusal to follow through or respond to requests, general recalcitrance, a strained relationship, questionable expenses, etc.).  This, along with the other factors discussed in this section, support an inference of pretext.

[55] At oral argument, Hansa's counsel represented that Dr. Lee warned Dr. Hidalgo-Semlek after the November 16 call that if she kept this up, she would be fired, and told Nigro after that call that she would have to fire Dr. Hidalgo-Semlek if this kept up, and that this shows the reasons for the termination were legitimate and non-pretextual.  Dr. Lee's deposition testimony does not support this allegation and it directly conflicts with Hansa's motion papers, where it represented that Dr. Lee made these statements prior to the November 16 call, not after.  The court accordingly cannot credit Hansa's representation at oral argument.

taking supervision from Nigro and issues with her expenses.[56]  Nigro also shared with Tulstrup

in late November that she was planning to terminate Dr. Hidalgo-Semlek.[57]  Tulstrup recalled

that Nigro cited as the primary reason for the termination decision, Dr. Hidalgo-Semlek's failure

"to deliver and to work as an employee that reported to Ms. Nigro and was under her supervision

and guidance.  And that she was not providing those deliverables that they had agreed on, there

was no follow through."[58]  Tulstrup testified that Nigro also referenced an issue with Dr.

Hidalgo-Semlek's expense reports as an additional concern.[59]

Besides offering Nigro's version of what occurred on the November 16 call, Hansa

argues that it would be speculative to infer that Dr. Hidalgo-Semlek's concerns about

unauthorized use of the SRTR data influenced Nigro's termination decision because there is no

evidence that Dr. Kjellman or Dr. Lee relayed these concerns to Nigro prior to or during the call.

In other words, Hansa argues that the reasons for the termination cannot be pretextual because

the decisionmaker was not aware of the protected conduct.  See Planadeball v. Wyndham

Vacation Resorts, Inc., 793 F.3d 169, 177 (1st Cir. 2015) ("Temporal proximity only supports an

inference of causation when the record shows 'that the decisionmaker knew of the . . . protected

conduct when he or she decided to take the adverse employment action.'") (quoting Pomales v.

Celulares Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006)).

---

[56] Doc. no. 25-12, at 4, 9.  Hansa submitted excerpts from Joed's deposition, so the court only
has limited aspects of her testimony at its disposal for purposes of deciding this motion.

[57] Doc. no. 28-7, at 11.

[58] Id. at 12.

[59] Id. at 11-12.

The court is not convinced.  Most significantly, there is evidence that Nigro was aware of other protected conduct from Dr. Hidalgo-Semlek, notably, Dr. Hidalgo-Semlek's resistance to providing the raw screening survey response data to Nigro and Litjens, despite several requests from Nigro to turn the data over.  Nigro conceded that Dr. Hidalgo-Semlek expressed concerns to her about exceeding the scope of the informed consent documents for the patient focus group prior to the November 16 call.[60]  This is sufficient at the summary judgment stage to establish Nigro's knowledge of some protected conduct and a jury could reasonably infer that those protected acts influenced both Nigro's behavior on the call and her decision to terminate the plaintiff.  Whether Nigro was aware of Dr. Hidalgo-Semlek's concerns about the SRTR data at the time of their November 16 call is therefore not necessarily material to deciding the pretext question at the summary judgment stage.

In any event, it is not speculative to infer that Dr. Kjellman or Dr. Lee passed along Dr. Hidalgo-Semlek's concerns about the SRTR data to Nigro prior to the fateful November 16 call.  Dr. Hidalgo-Semlek testified that earlier in the day on November 16, she called Dr. Kjellman and Dr. Lee, explained her concerns about what Nigro wanted to do with the SRTR data, and stated she was worried because she had a meeting with Nigro that same day.[61]  She testified that Dr. Kjellman told her he would "try to ameliorate the situation with [Nigro]" and assured her that he "will speak with her."[62]  Neither Dr. Lee nor Dr. Kjellman have a clear memory of this November 16 call, but a jury could infer from text messages between the parties that the call

---

[60] Moreover, Dr. Hidalgo-Semlek testified that in at least one of these conversations, Nigro implicitly threatened to fire her by stating words to the effect of "you have other options."  Doc. 28-4, at 190.

[61] Doc. no. 28-4, at 41.

[62] Id.

occurred.  Specifically, at 12:27 PM on November 16, Dr. Hidalgo-Semlek wrote to Dr.

Kjellman and asked if he had "sometime to speak with [Dr. Lee] and I today?".[63]  Dr. Kjellman

responded, "Sure give me a call."  Later that same afternoon at 3:34 PM, Dr. Hidalgo-Semlek

wrote to Dr. Kjellman – "Please try to join that call next Tuesday with the Terasaki Institute," a

call in which the SRTR project was to be discussed and the same call that Nigro wanted Ewy to

participate in.[64]  This evidence not only supports an inference that the call between Dr. Kjellman,

Dr. Lee, and Dr. Hidalgo-Semlek occurred on November 16, but it also supports the inference

that Dr. Kjellman spoke with Nigro that same day as well.  Dr. Kjellman did not unequivocally

deny that he ever spoke with Nigro about Dr. Hidalgo-Semlek's concerns, as Hansa argues.  He

testified that he did not recall if the conversation occurred.  At oral argument, Hansa cited to the

fact that Dr. Kjellman would have been several hours ahead of Nigro and it was thus unlikely

that he would call her late at night about this subject.  But the record evidence described above

supports a different inference, including the fact that as of 12:27 PM on November 16, Dr.

Kjellman was willing to speak with Dr. Hidalgo-Semlek, even though it was later in the evening

in Sweden.  While the evidence supporting this inference is thin, because there are so many

disputed facts about the turn of events on November 16, and the genuineness of these disputes is

frustratingly unclear, the court cannot conclusively decide that Dr. Hidalgo-Semlek's concerns

---

[63] Doc. no. 28-3, at 39.

[64] Id.  Dr. Hidalgo-Semlek's text messages with Dr. Lee on November 19, 2018 also support the
inference that she discussed her concerns about the SRTR data with Dr. Kjellman on November
16.  Specifically, she told Dr. Lee on November 19 that she "sent the abstract to [Dr. Kjellman]
just to CYA" and that she "was sick" but recalled Dr. Kjellman "saying send it to me only"
during a conversation they had the previous Friday (which would have been November 16).
Doc. no. 28-2, at 70.  The "abstract" Dr. Hidalgo-Semlek was referring to was for the SRTR
project.

about the SRTR data played no role whatsoever in Nigro's actions on the November 16 call or her decision to terminate.

In addition, while lean, the record includes evidence suggesting that Dr. Hidalgo-Semlek and Nigro discussed the SRTR project <u>during</u> the November 16 emergency room call.  For example, at 3:45 PM on November 16, Dr. Hidalgo-Semlek messaged Dr. Lee asking if he could "ask what she is trying to do with Gina?" and that Dr. Hidalgo-Semlek "may join for a few min."[65]  A rational fact finder could infer that "she" is a reference to Nigro and "Gina" is a reference to Gina Ewy, and that therefore Dr. Hidalgo-Semlek wanted Dr. Lee to ask Nigro about how she was trying to involve Ewy in the SRTR project.  At 4:05 that same afternoon, Dr. Hidalgo-Semlek sent Nigro a copy of the master services agreement between the Terasaki Institute and Hansa for the SRTR project, which also suggests that the SRTR project was a subject of the November 16 call.  Likewise, in a text message exchange that was introduced as an exhibit at Dr. Lee's deposition, but about which he was apparently not questioned, Dr. Lee and Dr. Hidalgo-Semlek appear to be discussing their November 16 call with Nigro and appear to describe the conversation in a way that supports Dr. Hidalgo-Semlek's recollection of the call. Specifically, a message from Dr. Lee that reads, "I know, she is evil . . . We gotta get the fuck out", to which Dr. Hidalgo-Semlek responded, "She is afraid and she showed it."[66]  Considering this evidence in the light most favorable to Dr. Hidalgo-Semlek, a jury could reasonably infer that the "she" in these messages is Nigro and that the "fear" Nigro was allegedly showing involved Dr. Hidalgo-Semlek's concerns about unauthorized use of the SRTR data.  Dr. Lee's reference to Nigro as "evil" and wanting to "get out" (presumably from under Nigro's

---

[65] Doc. no. 28-2, at 69.

[66] Doc. no. 28-2, at 141.

management) also supports the inference that Nigro was the aggressor and the hostile party on the call, as opposed to Dr. Hidalgo-Semlek.

At a minimum, then, this evidence reveals genuine material factual disputes as to both Nigro's and Dr. Hidalgo-Semlek's behavior on the November 16 call.  Viewing the record in Dr. Hidalgo-Semlek's favor, a rational fact finder could conclude that Dr. Hidalgo-Semlek in fact said little during the call and did not act aggressively toward Nigro.  A finding that Dr. Hidalgo-Semlek "did not engage in the behavior that her employer [primarily] cited in firing her" therefore "raises a genuine issue of fact as to whether the real reason for her termination was her protected activity-at least where, as here, there is additional evidence to that effect."  Grivois, 2014 WL 309354, at *10.  The factual disputes, lack of other corroborating evidence about the November 16 call, and record evidence (viewed in plaintiff's favor) lending credence to Dr. Hidalgo-Semlek's version of the call therefore undercut Hansa's stated primary reason for terminating Dr. Hidalgo-Semlek's employment and create a jury issue as to pretext, bad faith and malice.  See Coyne v. Taber Partners I, 53 F.3d 454, 460 (1st Cir. 1995) ("When the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage.").

The record evidence undercuts Hansa's stated reasons for Dr. Hidalgo-Semlek's termination in several other ways.  First, the close temporal proximity between Dr. Hidalgo-Semlek's protected acts and her termination, when combined with other evidence, may allow a reasonable jury to infer bad faith or retaliation on Hansa's part.  Straughn, 250 F.3d at 45 (finding that temporal proximity is a relevant factor but does not alone demonstrate bad faith); Harrington v. Aggregate Indus. Northeast Region, Inc., 668 F.3d 25, 32 (1st Cir. 2012) ("a

reasonable factfinder could focus on the close temporal proximity between" the plaintiff's protected activity and his termination and infer retaliation).

Second, the record does not support the allegation that Nigro terminated Dr. Hidalgo-Semlek due primarily to her failure to deliver according to Nigro's guidance and direction (as Tulstrup testified) or because of Dr. Hidalgo-Semlek's general "recalcitrance."  Nigro undermined the credibility of this reason when she testified at her deposition that she could not recall a single directive that she provided Dr. Hidalgo-Semlek that Dr. Hidalgo-Semlek did not follow.[67]  And of course, a jury could draw the inference that Nigro's reference to failing to deliver according to direction was actually a reference to Dr. Hidalgo-Semlek's refusal to provide Nigro or Litjens with the raw screening survey response data.

Third, based on the record evidence, a jury could reasonably conclude that Nigro's characterization of Dr. Hidalgo-Semlek as "unmanageable" actually reflected Nigro's frustrations with Dr. Hidalgo-Semlek's refusal to provide her with the raw screening survey response data, or her concerns with Ewy gaining access to the SRTR data for unauthorized purposes.  That is a reasonable inference to draw from the record evidence, especially in light of Nigro's failure to identify any examples of Dr. Hidalgo-Semlek's alleged inability to meet her directives, i.e. to be managed.

Fourth, Hansa's argument that Dr. Hidalgo-Semlek was terminated in part because she could not work well together with Nigro similarly lacks credibility.  Nigro and Dr. Hidalgo-Semlek worked together for less than two months before Nigro decided to terminate Dr. Hidalgo-Semlek.  The relationship was in its infancy and it appears almost no effort was made to repair it before Nigro pulled the plug.  This justification would also hold more credibility if the

---

[67] Doc. no. 28-5, at 7.

parties had worked together for years and the events of November 2018 were the culmination of a long, strained relationship, or if there was a pattern of Dr. Hidalgo-Semlek failing to get along with other managers or supervisors at Hansa. The opposite is true here. Dr. Kjellman and other Hansa employees who had worked with Dr. Hidalgo-Semlek prior to Nigro's arrival found Dr. Hidalgo-Semlek trustworthy and capable.[68]

General "strain" in a manager-employee relationship or the fact that the relationship had allegedly broken down may be a legitimate reason to terminate the subordinate under certain circumstances. Contrary to Hansa's arguments in its motion, however, the reason for the strain may have some bearing on the pretext and bad faith analysis. Viewing the evidence in Dr. Hidalgo-Semlek's favor, a rational fact finder could infer that Nigro's intent to involve Ewy in the SRTR project and provide the SRTR data to Ewy, and particularly, Nigro's requests for Dr. Hidalgo-Semlek to provide the raw screening survey data to Litjens or for market access purposes, were a (if not, the) source of strain between the two.

Taking the facts surrounding Dr. Hidalgo-Semlek's termination in the light most favorable to Dr. Hidalgo-Semlek, a jury question accordingly remains as to whether Hansa's main justification for terminating Dr. Hidalgo-Semlek was a pretext or instead motivated by bad faith, malice or retaliation. Evidence in the record weakens and discredits the "manageability" justification and there is sufficient dispute about this reason to preclude summary judgment on Dr. Hidalgo-Semlek's claims. See Cook, 2007 WL 3284337 ("While the question is close, the evidence that CTC terminated Cook for legitimate reasons, taken in the light most favorable to

---

[68] In order to paint the picture that Dr. Hidalgo-Semlek was a problem employee prior to Nigro's arrival, Hansa asserts that Tulstrup "expressed concerns [to Nigro] about plaintiff's job performance" when Nigro first joined Hansa. Doc. 29, at 8, n. 2 (citing pages 38-40 of his deposition). That is not what Tulstrup testified to at his deposition.

her, is not sufficient to support summary judgment."); Glandon, 408 F. Supp. 2d at 770

("Causation usually presents a question of fact, and certainly so if differing inferences can

reasonably be drawn from the undisputed facts. Whether the determining factor was the question

raised by Glandon, or the manner in which he raised it and subsequent refusal to write down

what he knew, is a hair too fine to split on summary judgment.") (citation omitted).

There is also evidence in the record from which a jury could infer that Dr. Hidalgo-

Semlek was terminated for pursuing policies condoned by her employer. Several other Hansa

employees, including Nigro, testified that they understood that Hansa had to stay within the

bounds of informed consent documents, and the Data Use Agreement and Security Plan, when

working with patient data obtained under the terms of those documents. Dr. Hidalgo-Semlek

raised concerns about exceeding the scope of these documents, and her manager decided to

terminate her shortly after she raised these concerns. That too is enough to raise a jury question

as to whether her termination was motivated by bad faith, malice, or retaliation. See Straughn,

250 F.3d at 44.

As for the secondary justification about alleged questionable expenses, the record

evidence also does not support – and in fact, discredits – this reason. First, Nigro testified that

she did not know if she would have terminated Dr. Hidalgo-Semlek based on questionable

expenses alone.[69] This admission significantly weakens the expense issue as a legitimate, non-

retaliatory reason for the termination, and a rational jury could conclude that this reason was in

fact pretextual or evidence of bad faith, malice, or retaliation.

Second, the timing of when the expense justification arose calls its legitimacy into

question. Based on the summary judgment record, it appears that the concerns about Dr.

---

[69] Doc. no. 28-5, at 17.

Hidalgo-Semlek's expenses genuinely arose after November 16, which is the date that Nigro decided to terminate the plaintiff.  For example, in a November 24, 2018 email to Coyne about Dr. Hidalgo-Semlek's expense reports, Nigro states "I approved most of [these expenses] because we don't have a policy in place, but Luchy requires formal training."[70]  Rather than indicate to Coyne that these expenses constituted a terminable offense, Nigro justified them and suggested that Dr. Hidalgo-Semlek needed training.  After further discussion, Nigro stated to Coyne on November 26, "regardless of approval of payments, we can still establish a pattern."[71]  A jury could infer from this evidence that Nigro was trying to use the expenses to justify her termination decision after the fact and create a record ("establish a pattern") of a "legitimate" reason for the termination.

While Coyne raised some concerns about expenses on November 6, she did not raise them to Nigro directly at that time, and did not mention Dr. Hidalgo-Semlek by name in her November 6 email.  Instead, Coyne's email used certain expenses as examples for why she believed Hansa needed to implement an expense reimbursement policy.  The fact that there was no company policy governing expense reimbursements, and employees were essentially on their own to figure out what could be expensed and how those expenses should be approved, also undermines the expense issue as a reason to terminate Dr. Hidalgo-Semlek.  See Theriault, 890 F.3d at 353.  For example, prior to Nigro's arrival and prior to the implementation of any formal policy, Dr. Kjellman had been reviewing and approving Dr. Hidalgo-Semlek's expense reports and did not have any concerns or see anything objectionable about her reports.  Nigro too had

---

[70] Doc. no. 28-5, at 138.

[71] Id. at 135.

approved most of the expense reimbursement requests that she later used to try and justify Dr. Hidalgo-Semlek's termination.

Third, there is evidence that other Hansa employees (including Nigro and Dr. Lee) were requesting similar expense reimbursements and did not receive any discipline or adverse employment action as a result.  Record evidence shows examples of Nigro expensing the company for personal charges, hosting a family member at her business hotel room, and charging the company higher amounts for similar expenses than what Dr. Hidalgo-Semlek charged.  Moreover, Dr. Lee sought reimbursement for many of the same expenses that allegedly led to Dr. Hidalgo-Semlek's termination, but Hansa did not discipline him for it.  For example, Dr. Lee expensed the same computer monitor and pre-flight candy, and rented the same type of vehicle as Dr. Hidalgo-Semlek at a conference, but experienced no adverse consequences for these actions.  A jury could therefore reasonably infer from this evidence that Hansa treated other similarly-situated employees disparately, and thus, its "expense" justification for terminating Dr. Hidalgo-Semlek was really a pretext and the termination was conducted in bad faith and with malice.  See Straughn, 250 F.3d at 44.

Finally, while not dispositive on its own, Dr. Hidalgo-Semlek provided an explanation for these allegedly questionable expenses, including that Nigro's allegation that Dr. Hidalgo-Semlek's family stayed with her at a hotel room at a conference in San Diego was based on an incorrect hotel receipt.  She provided a corrected receipt to Nigro and testified that her family stayed in a different hotel at no expense to the company.  This too undermines Hansa's stated reason for the termination.

In addition to the record evidence that undermines Hansa's stated reasons for its termination, other factors could cause a jury to infer that the termination was motivated by bad

faith or retaliatory motives.  For example, the circumstances leading up to the termination and the way Nigro terminated Dr. Hidalgo-Semlek could support such an inference.  In the call that directly led to her termination, Dr. Hidalgo-Semlek testified that Nigro insulted and degraded her and told her she needed to learn her place.[72]  And less than a week after asking a company HR representative for a meeting to discuss serious concerns about Nigro, Dr. Hidalgo-Semlek learned she was being terminated in a brief phone call with Nigro, in which Nigro did not provide any reasons for the termination.  This is all arguably indicative of bad faith or malice. See Cloutier, 121 N.H. at 921-22 (manner of termination suggested bad faith where, "[a]fter thirty-six years of employment, the plaintiff was suspended after a five-minute meeting and then discharged in an equally cursory manner" and employer "never informed the plaintiff of the allegations against him").

Taken together, the temporal proximity of the events leading to Dr. Hidalgo-Semlek's termination and her protected acts, evidence demonstrating lack of record support, or otherwise discrediting, Hansa's stated reasons for that termination, and evidence offered in support of an alternative motivation on Hansa's part create genuine factual disputes as to whether Hansa acted with bad faith or malice in terminating Dr. Hidalgo-Semlek and whether Hansa's reasons for the termination were pretextual.  As these issues are material to both of Dr. Hidalgo-Semlek's claims, they preclude summary judgment on this element as well.

---

[72] According to Dr. Hidalgo-Semlek, this all occurred while she was in the emergency room receiving medical treatment, allegedly because of the way Nigro had been treating her and because of what Nigro was asking her to do.  Doc. no. 28-4, at 40.

**IV.    Conclusion**

While a close case, given the factual disputes "swirling around" Hansa's termination decision, the court heeds the warning of the First Circuit Court of Appeals to be "particularly cautious about granting the employer's motion for summary judgment" where the employee makes out a prima facie case and the "issue becomes whether the employer's stated [nonretaliatory] reason is a pretext." Billings, 515 F.3d at 56. Hansa's motion for summary judgment[73] is accordingly DENIED.

**SO ORDERED**.

_____
Joseph N. Laplante
United States District Judge

Dated: October 30, 2020

cc:    Benjamin T. King, Esq.
       Megan E. Douglass, Esq.
       Lawrence Peikes, Esq.
       Ethan Severance, Esq.
       Aaron Frederick Lang, Esq.

---

[73] Doc. no. 25.